IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 07-00436 JMS |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING DEFENDANT'S |
| vs. | ) | MOTION TO SUPPRESS |
| | ) | STATEMENTS |
| DARRYL JAY ENGLISH, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

### I. INTRODUCTION

Defendant Darryl Jay English ("English") seeks an order suppressing statements that he made to federal law enforcement agents on June 6, 2007. The court finds that because English was not "in custody" at the time he made un-Mirandized statements to law enforcement, those statements are admissible in evidence at this trial. As a result, the Motion to Suppress Statements is DENIED.

### II. BACKGROUND

On June 6, 2007 at 6:00 a.m., federal law enforcement agents executed a search warrant at English's residence in Wahiawa, Hawaii. After entering the three-bedroom residence, FBI Special Agents Daniel Olson ("Olson")

and Brandon Simpson entered the last bedroom in the hallway of the apartment ("Bedroom # 3").  Olson observed English and Rachel Torres ("Torres") on a mattress, with both appearing as if they had been sleeping.  With his firearm drawn, Olson announced the presence of "police" with a search warrant, and ordered English and Torres to show their hands.  Both complied and were then handcuffed.

English was searched and found to have United States currency -- between $100 and $250 -- in a pants pocket.  The money was returned to English, and he was then removed from Bedroom # 3 to a holding area.[1]

Later, DEA Special Agent Richard Jones ("Jones") spoke to English. By this point, English was no longer constrained in handcuffs.[2]  Jones testified that he informed English that he was not under arrest, and then asked if English would voluntarily agree to accompany him to his office to talk with law enforcement agents.  English agreed.

---

[1] During the execution of the warrant, agents seized ziplock baggies containing a crystalline material, ziplock baggies containing a green substance, and a firearm from a closet in Bedroom #3.

[2] The various witnesses were unable to provide the time when English's handcuffs were removed.  Olson testified that his handcuffs (which were the ones placed on English at the outset) were returned to him prior to his departure from the residence at approximately 7:10 a.m. Regardless of the time frame involved, the record is clear that English was placed in handcuffs shortly after he was located in the residence, and the handcuffs were removed prior to the time that Jones spoke to him in Bedroom # 3.

Prior to leaving the residence, Jones again placed English in handcuffs. Jones credibly testified that he informed English that the handcuffs were being used for Jones' safety and his own safety. While waiting for transportation to the federal building, Jones observed a black truck. Upon questioning, English told Jones that the truck belonged to a friend, but that English was using the vehicle.[3] Although Jones considered asking English to drive the truck to the federal building, he rejected the idea after learning that English did not have a valid driver's license. Jones never informed English that he considered having English drive himself to the federal building. During this time period, English was cooperative and expressed no reluctance.

Honolulu Police Department Task Force Officer Damien Freitas ("Freitas") drove English to the federal building. During the transport, English sat in the front passenger seat while his hands were handcuffed behind his back.[4] Freitas testified that during this ride he made no promises or threats to English, the two of them engaged in small talk, and at no time did English express reluctance.

---

[3] English consented to a search of the vehicle, but nothing of evidentiary value was located inside the truck.

[4] Freitas also drove FBI Special Agent Patrick Donnelly to the search warrant's staging area at a nearby golf course. Donnelly, who sat in the back seat, carried an MP5 Machine Gun over his shoulder with the muzzle pointed down. Freitas's handgun was holstered and attached to his thigh.

After arriving at the FBI office, at approximately 9:00 a.m., DEA Special Agent Rory Fujimoto ("Fujimoto") removed English's handcuffs. Fujimoto introduced himself and told English that he was not under arrest, he could stop the questioning and leave at any time, and that he was free not to answer any question. Fujimoto further testified that he explained this in a casual tone without displaying any weapon, and that he repeated this statement during the course of the interrogation -- that English was at the FBI Office voluntarily and was free to leave -- five to six times.

English was then interviewed, without the advisement of any *Miranda* warnings, in a room approximately fifteen feet by fifteen feet. Various federal law enforcement agents participated in the interview process at different times. The door to the interview room remained unlocked during the interview, with the door open. English sat with his back to the door. Although no guard was posted outside the room, various agents milled about in the hallway during the course of the interview.

English agreed to speak to Fujimoto. He was then asked various questions regarding his drug use, drug distribution, and his knowledge of a larger

on-going investigation.[5]  Fujimoto testified that his tone of voice during the interview was casual, that he made no promises or threats, but that he did inform English that he was in trouble, that the FBI was seeking his cooperation, and that his cooperation could lead to a lesser term of incarceration.  English remained relaxed during the interview, never asking to leave or for an attorney.

During the interview, English was provided water, was offered some candy, and used the restroom on at least two occasions.  Fujimoto explained that an agent accompanied him to the restroom, as it was located outside of the secured FBI office space, and only an agent was able to enter the appropriate code to re-enter the FBI office.

English then agreed to provide a written statement.  After contacting an Assistant United States Attorney, Fujimoto then read English his *Miranda* rights from DEA Form 13A.  Gov. Ex. 1.  He was then provided an Advice of Rights FD-395 form, which sets forth the *Miranda* rights.  English then signed a statement on that form at approximately 11:35 a.m. stating that "I have read this statement of my rights and understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  Gov. Ex. 2.  English then

---

[5] According to Fujimoto, English admitted that the firearm found in his closet was his, that he was a drug user, and makes a living selling drugs.  Fujimoto also explained that given the amount of detail provided, he believed English's statements.

wrote a statement, admitting that he possessed the methamphetamine and handgun located in his bedroom closet.  Gov. Ex. 3.

At Fujimoto's request, English then agreed to become a DEA informant.  At approximately 1:00 to 1:30 p.m., he was taken to the DEA office, also in the federal building.  By this point, English was becoming tired.[6]  Fujimoto therefore determined to postpone the formal process required to activate English as an informant.  Fujimoto apparently told English that he could not be driven home due to a manpower shortage.  English stated that he may give Torres a call for a ride home, and then left the federal building at approximately 2:00 p.m. with his U.S. currency and cellular telephone.

### III.  <u>ANALYSIS</u>

English argues that his June 6, 2007 statements -- both pre- and postwarning -- are inadmissible.  First, he argues that he was in custody at the FBI office and subject to interrogation prior to the time that he was provided his *Miranda* rights.  Second, he claims that because he was in custody prior to his *Miranda* waiver, that waiver is tainted and the written statement must likewise be suppressed.  The government agrees that if English was in custody prior to being

---

[6] Fujimoto explained that towards the end of the interview, English began to fall asleep and stated that he had not slept for several days.

administered his *Miranda* warnings, then the court must suppress all of his June 6,

2007 statements, including the postwarning written statement.  *See Missouri v.*

*Seibert*, 542 U.S. 600 (2004).[7]  As a result, the sole issue before the court is

whether English was in custody during his interrogation prior to the time that he

waived his *Miranda* rights.[8]

        The warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966),

apply to custodial interrogations, meaning "questioning initiated by law

enforcement officers after a person has been taken into custody or otherwise

deprived of his freedom of action in any significant way."  *Id*. at 444.  *Miranda*

warnings must be administered

> only where there has been such a restriction on a
> person's freedom as to render him in custody.  Whether a
> suspect is in custody turns on whether there is a formal
> arrest or restraint on freedom of movement of the degree
> associated with a formal arrest.  This inquiry requires a
> court to examine the totality of the circumstances from

---

    [7] Applying *Missouri v. Seibert*, 542 U.S. 600 (2004), the Ninth Circuit held that "a trial
court must suppress postwarning confessions obtained during a deliberate two-step interrogation
where the midstream *Miranda* warning-in light of the objective facts and circumstances-did not
effectively apprise the suspect of his rights."  *United States v. Williams*, 435 F.3d 1148, 1157 (9th
Cir. 2006).  "In situations where the two-step strategy was not deliberately employed, [*Oregon v.*
*Elstad*, 470 U.S. 298 (1985)] continues to govern the admissibility of postwarning statements."
*Id*. at 1158.

    [8] English clarified during the hearing on his motion that he was not challenging the
voluntariness of his statement or the adequacy of the *Miranda* warnings actually given to him.

the perspective of a reasonable person in the suspect's
position.

*United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (internal

quotation marks, citations, and alterations omitted).  Two discrete inquiries are

essential.  First, "what were the circumstances surrounding the interrogation," and

second, "given those circumstances, would a reasonable person have felt he or she

was not at liberty to terminate the interrogation and leave."  *Thompson v.

Keohane*, 516 U.S. 99, 112 (1995).

Factors relevant to a custody determination include (1) the language

used by the officers, including the language used to summon the individual; (2)

the physical surroundings of the location where the questioning occurs; (3) the

extent to which the suspect is confronted with evidence of guilt; (4) the duration of

the detention; and (5) the degree of pressure applied to detain the individual.

*United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).  Other factors may

be relevant or even dispositive of the inquiry; these five factors "are simply ones

that recur frequently."  *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).[9]

---

[9] Other circuits use different formulations.  *See, e.g.,United States v. Plumman*, 409 F.3d
919, 924 (8th Cir. 2005) (listing factors as including: "(1) whether law enforcement informed the
suspect the questioning was voluntary, and the suspect was free to leave and was not under
arrest; (2) whether the suspect had unrestrained freedom of movement during the questioning; (3)
whether the suspect contacted the authorities or voluntarily agreed to official requests to answer
questions; (4) whether law enforcement employed strong-arm tactics or deceptive stratagems

(continued...)

That questioning takes place in a police station does not necessarily render the suspect "in custody."  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Coutchavlis*, 260 F.3d 1149, 1157 (9th Cir. 2001).  Further, "[b]eing aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the questioning was noncustodial." *Crawford*, 372 F.3d at 1060; *see also United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006) (finding that if suspect told by the officers that he was not in custody and was free to leave, evidence of "extensive" restraint necessary to overcome a finding that suspect was not in custody); *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998) (finding that statement to suspect that he was not under arrest, was free to leave at any time, and would not be arrested at the end of the interview was an "important factor" in the custody determination); *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (stating that the "most obvious and effective means" of demonstrating that a suspect is not in custody "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will").

---

[9](...continued)
during questioning; (5) whether the atmosphere of the interrogation was police dominated; or (6) whether law enforcement placed the suspect under arrest at the end of questioning.").

Although "the presence of handcuffs is an important factor in the determination of whether a person is in custody," *United States v. Touzel*, 409 F. Supp. 2d 511, 522 (D. Vt. 2006), "[h]andcuffing a suspect does not necessarily dictate a finding of custody." *United States v. Cervantes-Flores*, 421 F.3d 825, 830 (9th Cir. 2005) (*quoting United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981)); *see also United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990) ("[S]imilarly, the fact that officers handcuffed a suspect does not, in itself, automatically escalate a stop into an arrest."); *United States v. Bautista*, 684 F.2d 1286, 1292 (9th Cir. 1982) (upholding district court's finding that during a *Terry* stop handcuffed suspects were not in custody during questioning where the handcuffing was a reasonable measure under the circumstances). *But see United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) (finding suspect was in custody where he was questioned by FBI agent in back of a police car while handcuffed).

The court concludes -- after examining the totality of the circumstances -- that English was not in custody during the interrogation at the federal building. That is, after examining the surrounding circumstances, the court finds that English was not subjected to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,*

10

511 U.S. 318, 322 (1994) (per curiam) (citation and internal quotation marks omitted).

      While still at his residence, and after the handcuffs were removed, English voluntarily agreed to accompany agents to the federal building for an interview.  Before agreeing to the interview, Jones specifically informed English that he was not under arrest and that his decision to be interviewed would be voluntary.

      During the ride to the federal building English was constrained in handcuffs.  Although placing a person in handcuffs prior to questioning is suggestive of a formal arrest, Jones specifically told English that he would be temporarily handcuffed during the ride to the federal building for the safety of the agent and English's safety.  Under these circumstances, the initial handcuffing and the handcuffing during the ride to the federal building were neither excessive nor suggestive of "a formal arrest or restraint . . . of movement of the degree associated with formal arrest." *Crawford*, 372 F.3d at 1059.

      *Prior* to questioning, English's handcuffs were removed and he was told that he was not under arrest, he could stop the questioning and leave at anytime, and that he was free not to answer questions.  All of this was explained in a non-threatening manner and repeated to English five to six times during the

course of the interview.  In short, there was "no intimation that they would not permit him to leave if he desired."  *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005).

The interview itself took place in an FBI office with an open door and was non-confrontational, with English appearing relaxed throughout the interview. English never asked to stop the questioning or seek the advice of counsel.  English was provided water (and offered candy) and was able to use the restroom twice. After waiving his *Miranda* rights, English provided a written statement.  Later, he left the federal building, apparently to find his own way home.

Under the totality of the circumstances, the record demonstrates that during the interrogation English was not under arrest and he was not restrained in a manner that would normally be associated with an arrest.  Although English was placed in handcuffs *prior* to the interrogation, the handcuffs were removed and he was clearly informed that he was not under arrest and was free to leave before he was questioned.  The interrogation itself appears to have been non-confrontational, with little or no pressure applied to English, and was not unduly protracted.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion to Suppress

Statements is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 7, 2008.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. English*, Cr. No. 07-00436 JMS, Order Denying Defendant's Motion to Suppress
Statements